# In the United States Court of Federal Claims

### Nos. 16-446C, 16-447C, 16-448C
### (Filed: October 20, 2017)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **OMRAN HOLDING GROUP, INC.,** | |
| **Plaintiff,** | |
| v. | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Summary Judgment; Contract Disputes Act, 41 U.S.C. § 7101 (2012); 22 U.S.C. § 2363; 31 C.F.R. § 281.8; Exchange Rates; Currency Conversion.**

---

Dirk Haire and Alexa Santora, Fox Rothschild LLP, 1030 15th Street, NW, Suite 380 East, Washington, D.C. 20005, for Plaintiff.

Chad A. Readler, Robert E. Kirschman, Jr., Douglas K. Mickle, and P. Davis Oliver, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant. James Stephens, United States Army Corps of Engineers, P.O. Box 2250, Winchester, VA 22604, Of Counsel.

_____

## OPINION AND ORDER

_____

**WILLIAMS**, Judge.

In this unusual case, Plaintiff claims that the Government used a depreciated exchange rate in paying it under three contracts Plaintiff performed in Afghanistan. However, in actuality, the Government used an exchange rate that resulted in higher payments to Plaintiff than the regulations permitted.

---

[1]    The Court issued this Opinion under seal on September 28, 2017. The parties did not provide any redactions. Accordingly, the Court publishes this Opinion.

These three Contract Disputes Act ("CDA") cases come before the Court on the parties' cross-motions for summary judgment. 41 U.S.C. § 7101 et seq. (2012).[2]  Omran seeks damages totaling $1,418,925.22.  Because there are no genuine issues of material fact and Plaintiff has failed to establish underpayment, Plaintiff's motion for summary judgment is denied, and Defendant's cross-motion for summary judgment is granted.

## Background

### The Parties and the Contracts

Plaintiff, Omran Holding Group, Inc. ("Omran"), is an Afghan construction and engineering firm with its headquarters and principal place of business in Kabul, Afghanistan.  The firm has provided, among other things, services in Afghanistan to the United States Government and its agents and agencies.

During 2012-13, the United States Army Corps of Engineers ("USACE") awarded three contracts to Plaintiff ("the Contracts")- - the first on December 12, 2012, for the design and construction of the 203rd Corps Garrison in Gardez District, Paktiya Province, Afghanistan, the second on December 17, 2012, for the design and construction of the Afghan Air Force Forward Area Arming and Refueling Points in Gardez District, Afghanistan, and the third on March 12, 2013, for the adaptation and construction of a training center and support facilities for the Afghan National Army near Camp Hero in Kandahar Province, Afghanistan.  Upon performance, USACE was obligated to pay Omran in Afghani ("AFN"), the local currency of Afghanistan.

Each of these Contracts included Contract Clause 952.232-0002 – Notification of Payment in Local Currency (Afghanistan) (Dec 2011), ("the Local Currency Clause"), which provides:

> (a) Pursuant to the authority of USCENTCOM FRAGO's 09-1567 and 10-143 this contract will be awarded in Afghani (local currency) if awarded to a host nation vendor.  The contractor will receive payment in local currency via Electronic Funds Transfer to local (Afghan) banking institution.  Contracts/purchase orders shall not be awarded to host nation vendors (Afghan) who do not bank locally.  If awarded to other than a host nation vendor, the contract will be awarded in U.S. Dollars.  The currency exchange rate will be determined at the official exchange rate posted by the local DoD Finance office on the date of the payment in accordance with the Department of Defense Financial Management Regulation.

Am. Compl. 446 Ex. 5, at 2.

### Omran's Appeal to the Contracting Officer

On March 26, 2015, Omran submitted a certified claim to the USACE Contracting Officer, alleging underpayment on the three Contracts due to USACE's use of an incorrect exchange rate in converting U.S. dollars to AFN.  Omran argued that the Contract language was ambiguous regarding the exchange rate and the determination of which facility constituted the "local DoD Finance office" within the meaning of the Local Currency Clause.  Omran argued that USACE

---

[2]     On November 16, 2016, the Court consolidated Cases 16-446C, 16-447C, and 16-448C for all purposes.  See ECF Docket No. 21.

should have paid it using the Afghanistan National Bank rate instead of the less favorable rate set by the Treasury Department's International Treasury Service's ("ITS") online payments portal, ITS.gov.

In his May 16, 2015 final decision, the Contracting Officer denied Omran's claim for underpayment, stating:

> The contractor asserts that the Government did not set the exchange rate at the "local DoD Finance office" but rather relied on an exchange rate established by the U.S. Treasury's International Treasury Services ("ITS") website.  There is no "local DoD Finance office" in GIRoA.  For the purposes of this contract, the "local DoD Finance office" is located at the U.S. Army Corps' of Engineers' Finance Center ("UFC"), located in Millington, Tennessee.  The UFC notifies the Treasury ITS of the dollar amount of the Pay Estimate and the ITS then makes payment in Afghani currency to the designated account.  The rates are set by Treasury, not USACE.  The exchange rate of the National Bank of Afghanistan is not a factor in this process.

Am. Compl. 446 Ex. 5, at 3; Am. Compl. 447 Ex. 5, at 3; Am. Compl. 448 Ex. 5, at 3.

## Discussion

## Jurisdiction and Legal Standards

This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(2) and the Contract Disputes Act ("CDA"), 41 U.S.C. § 7104(b).  The Tucker Act grants the Court jurisdiction over:

> [A]ny claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  However, the Tucker Act is not money-mandating, but rather is a jurisdictional statute.  United States v. Testan, 424 U.S. 392, 398 (1976).  To establish jurisdiction, a plaintiff must seek money damages under a source of substantive law.  "[T]he claimant must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'"  United States v. Mitchell, 463 U.S. 206, 216-17 (1983) (quoting Testan, 424 U.S. at 400); see Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008) ("[A] plaintiff must identify a separate source of substantive law that creates the right to money damages.") (internal citation and quotation marks omitted).

Because the CDA is a money-mandating statute that applies to contracts made by executive agencies, this Court possesses jurisdiction to consider claims arising under the CDA.  See G.E. Boggs & Assocs., Inc. v. Roskens, 969 F.2d 1023, 1026 (Fed. Cir. 1992); Cal. Dept't of Water Res. v. United States, 128 Fed. Cl. 603, 610 (2016) (citing Palafox St. Assocs., L.P. v. United States, 114 Fed. Cl. 773, 780 (2014)).  Under the CDA, this Court reviews the contracting officer's decision de novo.  41 U.S.C. §7104(b)(4) (2016); Timber Prods. Co. v. United States, 103 Fed. Cl.

225, 241 (2011).  "[B]ecause the court's review is de novo, the contracting officer's decision is afforded no deference."  <u>Baldi Bros., Inc. v. United States</u>, No. 15-1300C, 2017 WL 4052368, at *2 (Fed. Cl. Sept. 13, 2017).  The findings of fact in the contracting officer's decision "are not binding in any subsequent court proceeding," and "are not entitled to any deference."  <u>Wilner v. United States</u>, 24 F.3d 1397, 1401 (Fed. Cir. 1994).

When interpreting a contract provision in which the United States is a party, the court "appl[ies] general rules of contract interpretation."  <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d 817, 824 (Fed. Cir. 2010) (citing <u>Lockheed Martin IR Imaging Sys., Inc. v. West</u>, 108 F.3d 319, 322 (Fed. Cir. 1997)).  The terms of the contract "are given their plain and ordinary meaning unless the provisions are ambiguous."  <u>Id.</u> (citing <u>Alaska Lumber & Pulp v. Madigan</u>, 2 F.3d 389, 392 (Fed. Cir. 1993)).  A contract term is ambiguous when "it is susceptible of two different yet reasonable interpretations, each of which is consistent with the contract language and with the other provisions of the contract."  <u>Lockheed Martin</u>, 108 F.3d at 322.  "[A]n interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless."  <u>Fortec Constructors v. United States</u>, 760 F.2d 1288, 1292 (Fed.Cir. 1985).  "Issues involving contract interpretation often are resolved through summary judgment, because contract interpretation generally is a matter of law."  <u>Northrop Grumman Computing Sys., Inc. v. United States</u>, 93 Fed. Cl. 144, 148 (2010) (citing <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004)).

## The Proper Exchange Rate

## The Government Paid Omran Using a Higher Exchange Rate Than Required

At issue in this consolidated case is what exchange rate Plaintiff should have received under the Local Currency Clause.  Clause 952.232-0002(a) provides:  "The currency exchange rate will be determined at the official exchange rate posted by the local DoD Finance office on the date of the payment in accordance with the Department of Defense Financial Management Regulation."  This clause does not elaborate on what either the "official exchange rate" or the "local DoD Finance office" is.[3]

The Government paid Omran using the ITS.gov system - - the online payments portal referenced in the DoD Financial Management Regulation and the Department of Treasury's Financial Manual.  Department of Defense Financial Management Regulation 7000.14-R (DoD FMR), Vol. 5, Ch. 12, ¶ 120104, "Use of Foreign Currency," provides:

> When a foreign currency payment needs to be made, the preferred method of payment is via the International Treasury Services, *ITS.gov*, the Department of the Treasury's . . . comprehensive international payment and collection system.

Dep't. of Defense, Office of the Undersecretary of Def. (Comptroller), Financial Management Regulation 7000.14-R, Vol. 5, Ch. 12, ¶ 120104 (2011).  Chapter 3000 of the Department of the Treasury's Financial Manual describes the system as follows:

---

[3]     The Contracting Officer determined that the USACE Finance Center in Millington, Tennessee was the "local DoD Finance Office," under the Clause, but neither party has espoused this position.

ITS.gov enables federal agencies to issue U.S. dollar and foreign currency payments electronically using the [Automated Clearing House] network, Fedwire, and the Society for Worldwide Interbank Telecommunication (SWIFT) to nearly 200 foreign countries.    Additionally, ITS.gov enables agencies to issue international U.S. dollar wire transfer payments without a corresponding U.S. financial institution.  <u>Agencies should use ITS.gov to make foreign benefit, payroll, vendor, and miscellaneous payments electronically.</u>

Treas. Fin. Man., Ch. 3000, § 30115.10e (emphasis added).

Walker Woods, the Department of Treasury, Bureau of the Fiscal Service's ITS.gov Operations Supervisor and Project Manager, testified that ITS.gov provides multiple exchange rate options to the federal agencies it serves, that those agencies are free to choose whichever rates best suit their needs, and that the Bureau of Fiscal Service and ITS.gov do not "approve, deny, or otherwise mandate a participating federal agency's use of an ITS.gov established rate structure." Woods Decl. ¶¶ 1-6 (June 28, 2017).  As relevant here, ITS.gov provides a 3-day or 5-day rate to be used at the agency's option.

Kevin Heath, a Disbursing Officer at the USACE Finance Center, testified that USACE elected to use the ITS.gov 3-day rate to pay Omran after several meetings with the Bureau of Fiscal Service as that rate best suited USACE's needs.  Heath Decl. ¶ 6 (June 28, 2017).  Russell T. Hacecky, the U.S. Army's ITS.gov Program Manager, testified that between June 2013 and October 2015, (the period covering the submission of the first and last invoices under the three Contracts) Army personnel "were only authorized to use the Department of the Treasury's ITS.gov 5-day exchange rate for payment and collection of Afghan currency," and that "the ONLY rate available for viewing [and use] is the 5 day rate for any Army personnel in the Middle East, including any Army finance office in Afghanistan, Iraq and Kuwait."  Hacecky Decl. ¶¶ 2, 6-7 (emphasis in original).  In addition, the 5-day rate was the rate that was posted by the local DoD Finance office, the 159th Financial Management Support Division at Bagram Airfield.

Nonetheless, in an odd, unexplained turn of events, the Army Corps of Engineers did not pay Omran using the 5-day rate and instead paid Omran at a higher 3-day rate.  Plaintiff argues that Defendant has not explained how it was able to use the 3-day rate if the 5-day rate was the "only" one it was supposed to be using.  This is true, but it does not help Plaintiff.[4]  Although, as the Government acknowledges, the 3-day rate available on ITS.gov was <u>not</u> the "official" rate for the purposes of Clause 952.232-0002, this rate was nevertheless more favorable to Omran than the 5-day rate.  Plaintiff does not deny that the 3-day rate was higher than the 5-day rate, but instead injects yet another rate into this controversy, arguing that a quarterly rate published by the Bureau of Fiscal Service should be interpreted as the "official rate" for purposes of Clause 952.232-0002.

However, the quarterly Bureau of Fiscal Service rates are to be used for intra-governmental reporting, not conversion and payment through ITS.gov.  As stated on the Bureau of Fiscal Service's website, "[t]his quarterly report reflects exchange rates at which the U.S. government

---

[4]    The only explanation is Mr. Heath's testimony in his second declaration that USACE had several meetings with the Bureau of Fiscal Service, and as a result of those meetings, USCAE was given the option to use the 3-day rate, which it chose to do because it was in the agency's best interest without elaboration.  Heath Decl. ¶ 6 (June 28, 2017).

can acquire foreign currencies for official expenditures as reported by disbursing officers for each post on the last business day of the month prior to the date of the published report." Pl.'s Mot. Summ. J. 10. Plaintiff confuses currency "conversion" or "disbursement" operations performed by the Government with the "acquisition" or "purchase" of foreign currency. The DoD FMR, the Treasury Financial Manual, and the testimony of a USACE Disbursing Officer and an ITS.gov Operations Supervisor and Project Manager establish that the "acquisition rate" cited by Plaintiff is not appropriate under the Contracts. Section G, Paragraph 120402 of Volume 5, Chapter 12 of the DoD FMR provides "[w]here there is [a Military Banking Facility] in-country, [Disbursing Officers] purchase foreign currency for official use at the official rate." As Mr. Heath, a USACE Disbursing Officer, testified, this "official rate" refers to USACE's purchase of only three currencies for its Limited Depository Accounts: Won, Yen, and Euro. "For all other currencies, including Afghani, USACE uses ITS.gov to convert U.S. dollar payments . . . [and] does not purchase currency." Heath Decl. ¶ 7 (June 28, 2017).

Plaintiff further argues that the Contracts required the Government to make payments according to an official "posted" exchange rate and that USACE violated that requirement by utilizing an exchange rate not available to the public. In support of this argument, Omran asserts that, as a division of the Treasury, ITS.gov does not fall within the administrative ambit of the Department of Defense, and therefore, "logically cannot be deemed a 'local DoD Finance office.'" Additionally, Plaintiff contends that the ITS.gov rates lack the requisite degree of publicity to be "posted," because the ITS.gov website can be accessed only by select Government employees with the requisite login credentials, and that the rates it posts "are not publicized, advertised, announced or otherwise made available to the public . . . ." Pl.'s Mot. Summ. J. 15.

However, the record establishes that the 159th Financial Management Support Detachment (FMSD) was the "local DoD Finance office" in Afghanistan within the meaning of the DoD FMR and Contract Clause 952.232-0002. The Government presented uncontroverted testimony that "on a weekly basis, the 159th FMSD – one of two Army finance offices located in Afghanistan – posts Treasury's ITS.gov 5-day exchange rate in an area accessible to anyone with authorized access to Bagram Airfield," and that the rates the FMSD "posted" constitute the proper currency exchange rates mandated by the Local Currency Clause. Def's. Mot. Summ. J. 8 (emphasis added); Halonen Decl. ¶¶ 5-8; Tuiaana Decl. ¶¶ 2-5.

Lieutenant Joseph McManus, who has served as the Disbursing Agent for the 159th FMSD at Bagram Airfield in Afghanistan since November 17, 2016, testified that his office receives the 5-day exchange rate for Afghanistan from an Army finance office in Kuwait on a weekly basis, which his office then "posts" in an area accessible to anyone with authorized access to Bagram Airfield. McManus Decl. ¶¶ 1-9. Captain Joshua Halonen, who has served as a Deputy Disbursing Officer for the 376th Financial Management Support Unit (376th FMSU) at Camp Arifjan, Kuwait, since October 2016, testified that his office transmits the current ITS.gov 5-day rate to its subordinate unit, the 159th FMSD at Bagram Airfield on a weekly basis for that unit to "post" and use for payment and collection of AFN. He further testified that he learned of this "standard operating procedure to post the ITS.gov 5-day exchange rate from [his] predecessor sometime in February 2014," and it was his understanding that his predecessor "also engaged in this practice" prior to February 2014 - - before the time the Contracts were signed. Halonen Decl. ¶¶ 1-9. Captain Halonen's predecessor, Ms. Evelyn Tuianna, testified that each Army finance office in Afghanistan was required to use the 5-day rate, and employed the practice of posting those rates

each week throughout the period during which the Contracts were executed and fulfilled. Tuianna, Decl. ¶¶ 1-8.

In sum, the record demonstrates that the 159th FMSD posts the ITS.gov 5-day rate weekly, that every DoD Finance office in Afghanistan uses this weekly rate, and that Bagram Airfield acted as the "local DoD Finance office" under the Contracts' Local Currency Clause. The fact that the Army Corps of Engineers paid Omran using the 3-day rate appears to have been wrong, but that error is of no moment here.

The Government is not seeking to recoup amounts it overpaid Omran due to its cryptic choice to pay the 3-day rate instead of the 5-day rate. Whatever the Government's rationale for paying the higher 3-day rate may have been, it benefited Omran and caused it no prejudice. Because Omran was not harmed by receiving the more generous 3-day rate, it cannot recover damages. See Northrup Grumman Computing Sys., Inc. v. United States, 823 F.3d 1364, 1368 (Fed. Cir. 2016) ("It is fundamental in contract law that in order to recover on a breach of contract claim, a plaintiff must prove damages – that it has been harmed."). In Northrup, the Court of Appeals for the Federal Circuit found that the plaintiff was not entitled to recover damages because it was "in at least as good, if not better, a position as it expected . . ., and it has not shown any particular harm to itself flowing from the alleged breach." Id. The same can be said of Omran here.

## Conclusion

Plaintiff's motion for summary judgment is **DENIED**, and Defendant's cross-motion for summary judgment is **GRANTED**. The Clerk is directed to enter judgment.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**